903 F.2d 1244
 1990 A.M.C. 2235
 TOKIO MARINE & FIRE INSURANCE COMPANY, LTD., Plaintiff-Appellee,
v.
VESSEL SAMMI AURORA, its Engines, Tackle, Apparel,
Furniture, etc., Defendant,
and
Pan Ocean Shipping Co., Ltd.; Haisi Shipping, S.A.,
Defendants-Appellants.
 No. 89-55144.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 9, 1990.
Decided May 21, 1990.
 
 David E.R. Woolley, Williams, Woolley, Cogswell, Nakazawa & Russell, Long Beach, Cal., for defendants-appellants Pan Ocean Shipping Co., Ltd. and Haisi Shipping, S.A.
 Joseph P. Tabrisky, Fisher, Porter & Kent, Long Beach, Cal., for plaintiff-appellee Tokio Marine & Fire Ins. Co., Ltd.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, NOONAN and FERNANDEZ, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 Tokio Marine and Fire Insurance Company, Ltd. (Tokio Marine) brought suit to recover from Pan Ocean Shipping Co., Ltd. and Haisi Shipping, S.A. (the carrier) the money paid by Tokio Marine to its assured, Mitsubishi International Corporation (the shipper). The action was brought under the Carriage of Goods By Sea Act, 46 U.S.C.App. Secs. 1300-1315. In a bench trial, Tokio Marine was awarded damages of over $41,000. The carrier appealed.
 
 
 2
 This garden-variety dispute between a shipper and an ocean carrier is here on appeal because the carrier has made an issue of the kind of notice and cooperation it received from the shipper. The standards, although well known, deserve reaffirmation. We affirm the district court.
 
 FACTS
 
 3
 The facts, as found by the district court and supported by the evidence before it, are as follows.
 
 
 4
 The shipper delivered galvanized steel pipes in bundles to the carrier at Busan, Korea. The carrier issued Mate's Receipts noting that five pieces of steel were bent; there were no other exceptions noted to the condition of the steel. The cargo was carried by a ship owned by the carrier, the M/V Sammi Aurora, to Seattle, Washington, docking August 23, 1985.
 
 
 5
 The shipper sold the steel pipe to R.J.B. Wholesale, Kirkland, Washington, for $187,991.07. R.J.B. is a seller of new steel pipes to ultimate users. From August 27 to September 3, 1985 R.J.B. picked up the cargo from the dock, using both its own truckers and common carriers. The truckers' delivery receipts noted exceptions to the condition of the cargo: one receipt noted "white rust"; two receipts noted "white rust all pipe"; one receipt noted "staining" as to three bundles; and another receipt noted that pipe ends were bent. Only one receipt noted no exceptions to the condition of the pipes on delivery. The truckers brought the pipes to R.J.B.'s facility in Kirkland, a distance of approximately 14 miles. On inspection at Kirkland, deposits of a contaminant were found which had oxidized the galvanized coating of the pipe, causing white rust to form in the areas immediately surrounding the contaminant. Numerous pipes had been bent and physically damaged.
 
 
 6
 On September 4, 1985 the shipper sent a letter to the carrier informing it that the shipper intended to claim damages. The letter was sent to the carrier's Long Beach office.
 
 
 7
 On September 9, Captain Andrew J. King of Alexander Gow, Inc., a surveyor appointed by Tokio Marine, surveyed the pipes. He submitted samples of contaminated pipe to an independent testing laboratory for analysis. The laboratory reported concentrations of potassium and chlorides where there was rust. In January 1985 the Sammi Aurora had carried potash in her holds. There was no showing of potash in contact with the pipes at the dock in Seattle or at Kirkland. Captain King concluded that the contamination damage had occurred as a result of exposure to potash residue on the Sammi Aurora.
 
 
 8
 Taking into account the damage due to the contamination and the physical injury to the pipes--some of which were total losses--Captain King allowed R.J.B. a deduction of $41,244.42 from the selling price. Tokio Marine reimbursed the shipper for this amount.
 
 PROCEEDINGS
 
 9
 Tokio Marine filed suit March 1, 1987 against the carrier. A one-day trial was held on September 7, 1988. Captain King testified for Tokio Marine. The carrier presented one witness, Captain McGee, who testified that the Sammi Aurora had been graincleaned after she had carried potash from Vancouver to the Far East. Captain McGee's testimony was that proper graincleaning would eliminate residues of potash, but Captain McGee had not personally inspected the Sammi Aurora. The district court believed Tokio Marine's witness and accepted the findings of fact and conclusions of law prepared by Tokio Marine. The carrier appeals.
 
 ANALYSIS
 
 10
 The Carriage of Goods By Sea Act has carefully set out the responsibilities and liabilities of the carrier and the burden of proof in the event of dispute between the carrier and the shipper. The carrier has the duty to exercise due diligence to make the holds in which goods are carried "fit and safe for their reception, carriage and preservation." 46 U.S.C.App. Sec. 1303(1)(c). The bill of lading is prima facie evidence of receipt by the carrier of the goods as described. Id. Sec. 1303(4). When damage results from unseaworthiness, the burden of proving due diligence is on the carrier. Id. Sec. 1304(1) The carrier is not liable for damages arising without its actual fault, but the burden of proof to show that it was without its fault rests with the carrier. Id. Sec. 1304(2)(q); see Taisho Marine & Fire Ins. Co. v. M/V Sea-Land Endurance, 815 F.2d 1270, 1274-75 (9th Cir.1987).
 
 
 11
 In the present case the carrier failed to carry its burden of proof. In argument it offers vague speculation that there could have been potash residue in the trucks that transported the cargo from Seattle to Kirkland. Such guesses are no substitute for evidence. On the other hand, there was evidence that potash had been in the holds of the Sammi Aurora, and evidence that potash had caused the damage. The district court was not clearly erroneous in finding as a fact that it was potash residue in the Sammi Aurora that caused the contamination.
 
 
 12
 The carrier argues that the shipper failed to comply with the requirement of 46 U.S.C.App. Sec. 1303(6) that "notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the point of discharge before or at the time of the removal of the goods." The penalty for failing to give such notice is that acceptance of the goods becomes prima facie evidence of delivery by the carrier of the goods in the condition described in the bill of lading. It is apparent that notice to the carrier in Long Beach did not comply with the requirement of notice at the port of discharge. However, the truckers' receipts were sufficient notice of damage and the general nature of the damage. Nothing more was required by the Carriage of Goods by Sea Act, which provides expressly that notice of damage may be endorsed on the receipt for the goods by the person taking delivery. Id.
 
 
 13
 The carrier argues further that the Act requires the receiver of damaged goods to "give all reasonable facilities" to the carrier for inspecting the goods. The carrier complains that it had no notice of Captain King's appointment and surveying of the cargo. Captain King testified that he would have been glad to have had with him a surveyor appointed by the carrier, but that it was "most unusual for the ocean carriers currently in the steel trade to appoint surveyors to accompany underwriter surveyors." It was his experience that "despite notification of claims, ocean carriers refrain from appointing surveyors to represent their interest." He had never been accompanied by a Pan Ocean surveyor on a survey.
 
 
 14
 Given this practice, as to which there was no contrary evidence, there was no obligation on the part of Tokio Marine to urge the carrier to join in Captain King's survey. The carrier was on notice when it received the truckers' notice of damage. The carrier had every opportunity to follow up on these notices by contacting R.J.B. and appointing its own surveyor to inspect the pipes at Kirkland. The carrier failed to do so. It cannot now complain that it was denied reasonable facilities to inspect the goods.
 
 
 15
 Finally, the carrier objects to the damage estimated by Captain King and paid by Tokio Marine to the shipper as reimbursement. The question is simply one of evidence as to which the district court was not clearly erroneous.
 
 
 16
 Tokio Marine contends that the carrier misrepresented the record on appeal and requests that sanctions be imposed on carrier's counsel. The carrier's brief should have been more carefully researched and prepared. The representation of the record was not so misleading as to warrant sanctions.
 
 
 17
 AFFIRMED.